IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE:<br><br>AIDA LUZ CHICO PEÑA,<br><br>Debtor<br><br>_____<br>SUCESION GONZALEZ COLLAZO<br>COMPOSED OF EDA GONZALEZ<br>COLLAZO; BLANCA GONZALEZ<br>COLLAZO; BRENDA CONZALEZ<br>RAMOS; FELIZ GONZALEZ JIMENEZ;<br>MARTA M. GONZALEZ; AND SONIA<br>GONZALEZ BELTRAN,<br><br>    **Plaintiffs-Appellees,**<br><br>      **v.**<br><br>AIDA LUZ CHICO PEÑA, *et al.,*<br><br>    **Defendants-Appellants.** | **Civil No.** 12-1986 (FAB) |

**MEMORANDUM AND ORDER**

BESOSA, District Judge.

**BACKGROUND**

## I.  Factual Background

The Court draws the following "uncontested material facts,"[1]

*verbatim*, from the bankruptcy court's Opinion and Order ("O&O")

dated September 8, 2011, (Docket No. 6-13 at pp. 8-10):

---

[1] Both parties indicated that they agree with the bankruptcy court's version of the facts contained in the Opinion & Order, and they adopted those facts as "uncontested facts" in their pre-trial report.  (See Docket No. 6-20 at pp. 4-5.)

Appellant Aida Luz Chico-Peña ("Ms. Chico") and the decedent Mr. Felix Gonzalez-Figueroa ("Mr. Gonzalez") were in a relationship in which they procreated five (5) daughters out of wedlock. Mr. Gonzalez was legally married to Ms. Juana Collazo-Gonzalez ("Ms. Collazo").

Mr. Gonzalez passed away on April 3, 2002 intestate.  He was married to Ms. Collazo.

Mr. Gonzalez and Ms. Chico had a relationship in which they procreated the following heirs:  Jannette Vanessa Gonzalez Chico; Raquel Gonzalez Chico; Maria del Carmen Gonzalez Chico; Rosa Milagros Gonzalez Chico; and Blanca Luz Gonzalez Chico.

Ms. Chico appears as the owner in the Property Registry[] of the properties included in the state court case number LAC2002-0054 and in the bankruptcy petition in case number 09-05922(ESL).

A private document was executed on June 18, 1981 between Ms. Chico and Mr. Gonzalez in which they both recognized that Ms. Chico bought certain properties with monies received from Mr. Gonzalez and registered the same under her name in the Property Registry.  Ms. Chico bought the following real estate properties:

> A.   Property located at #126 Comercio Street, Lares, 2 story small building with 4 apartments.  1-3 bedrooms and 1 bathroom; 2-2 bedrooms and 1 bathroom; 3-3 bedrooms and 1 bathroom; 4-3 bedrooms and 1 bathroom.
>
> B.   Residential property located at #125 Comercio Street, Lares, PR, consisting of a 2 story concrete house with 4 bedrooms and 3 bathrooms, land of approximately 2 "cuerdas."

C.   Residential property located at #4 Echagaray Street, Lares, PR, consisting of a concrete house with 3 bedrooms and 1 bathroom.

D.   Residential Property located at #5 Echagaray Street, Lares, PR, consisting of a concrete house with 4 bedrooms and 2 bathrooms and car port.

The properties listed in the preceding paragraph are the subject of the instant action.

In the above-referenced private document, Mr. Gonzalez and Ms. Chico acknowledged that the properties that are registered under the name of Ms. Chico were acquired with monies from Mr. Gonzalez.

At the time the aforementioned private document was signed, Mr. Gonzalez was married to Ms. Collazo.

In the FIFTH paragraph of the private document signed by Mr. Gonzalez and Ms. Chico, the former expressed his intention that the properties bought under Ms. Chico's name be given to the daughters they have in common in concept of their inheritance.

At the time the aforementioned private document was executed, Mr. Gonzalez was married to Ms. Collazo.  Ms. Collazo never appeared in this document to consent the transfer of property.

The private document was signed by Mr. Gonzalez and Ms. Chico before a Notary Public, in Lares, Puerto Rico.[2]

Ms. Collazo passed away on September 9, 1996.

Ms. Chico is in the physical (natural) possession of the properties.

Ms. Chico has been uninterruptedly in possession of the properties subject of this action since they were acquired under her name through public deeds in 1980 and 1981.

Ms. Chico has been a resident of Lares, Puerto Rico all her life.

Ms. Chico knows from first hand knowledge that both Mr. Gonzalez and Ms. Collazo[], lived uninterruptedly in Lares, Puerto Rico, until their respective deaths.

The state court case was filed in the year 2002.

In the state court case, Marta Miriam Gonzalez Collazo v. Felix Gonzalez Collazo, _et als._, Num. LAC 2002-00054, Ms. Chico in

---

[2] The bankruptcy court highlighted the following section from the private document, noting that the admonition "turned into a presage of the outcome of this case":

SEVENTH: I, The Notary Public, having admonished the deponents of the convenience and desirability of what is herein expressed and accepted by them be done by Public Writ and Last Will and Testament, which they decide not to do at present, since Mr. Gonzalez wishes to reach an agreement with his wife and other heirs as to the properties that shall be adjudicated to each one of them at his death.

(Docket No. 7-9 at p. 8.)

a deposition (pg. 43 of the deposition transcript) regarding such
case[] testified on February 8, 2006, that she did not give
Mr. Gonzalez money and what she would do to help him (Mr. Gonzalez)
with the business was to "[t]hen pray to God so that everything
will go well."  Mrs. Chico admitted on page 55 of the above-
referenced deposition that Mr. Gonzalez paid for everything,
including utilities.

Ms. Chico mortgaged one of the properties in #126 Comercio
Street, Lares with Westernbank.

Westernbank was closed by the Federal Deposit Insurance
Corporation on April 30, 2010.

## II.  Procedural History

The Court takes the following facts regarding the case's
procedural history from the bankruptcy court's O&O dated
November 14, 2012, (Docket No. 7-9 at pp. 2-8):

Ms. Chico filed a bankruptcy petition under Chapter 13 of the
Bankruptcy Code on July 17, 2009.  She included in her Schedule A
(Real Property) four (4) real estate properties.  In her Statement
of Financial Affairs, she disclosed that she was a party in the
court case No. LAC 2002-0054, Marta Miriam Gonzalez Collazo v.
Feliz Gonzalez Collazo, et als. v. Aida L. Chico Peña, and that the
nature of the proceeding was a civil suit regarding the
distribution of the assets of a decedent's estate.  On July 17,
2009, Ms. Chico filed her Chapter 13 Payment Plan, in which she

proposed to sell two (2) real properties — described as #5 Echegaray St. and #4 Echegaray St. in Lares, Puerto Rico — to partially fund the plan.  She amended her plan on November 25, 2009, and the Court confirmed the Amended Chapter 13 Payment Plan on December 17, 2009.

On April 23, 2010, the Gonzalez-Collazo Sucesion ("the Sucesion") filed an adversary proceeding before the bankruptcy court to obtain a declaratory judgment and enforceable order establishing that the real properties Ms. Chico included in her bankruptcy petition are not property of the bankruptcy estate, but rather are property of the Sucesion.  On December 21, 2010, the Sucesion filed a motion for summary judgment in which they argued that (1) the execution of the deeds of sale for the real properties in controversy are invalid due to a simulated contract; and that (2) Ms. Chico did not acquire the real properties in controversy through prescription by possession with good faith and proper title, nor without good faith or proper title, pursuant to articles 1857 and 1859 of the Puerto Rico Civil Code.  Laws of P.R. Ann. tit. 31 §§ 5278, 5280.  The Chicos filed a motion to dismiss the Sucesion's motion for summary judgment as well as a cross motion for summary judgment on February 2, 2011, contending that the properties do indeed constitute part of Ms. Chico's bankruptcy estate because she acquired the properties via adverse prescription pursuant to the Civil Code.  On February 23, 2011, the Sucesion

opposed the Chicos' cross motion for summary judgment, and one day later the Chicos filed a second motion to dismiss the Sucesion's motion for summary judgment as well as a cross-motion for summary judgment.

On September 8, 2011, the bankruptcy court entered an Opinion and Order holding that the acquisitive prescription *secundum tabulas* doctrine was inapplicable to the Chicos' claims. (Docket No. 7-9 at pp. 1-2.)   Addressing the rationale behind the acquisitive possession *secundum tabulas* doctrine*,* the bankruptcy court found that the Chicos cannot satisfy the third element of the claim requiring that Ms. Chico acquired the property from a *non dominus* third party.  Id. at p. 14.  Accordingly, it granted in part the Sucesion's motion for summary judgment.  Id. at p. 2.  The bankrutpcy court noted, however, that it was not in a position to readily rule on the issue of the existence of a simulated contract at that time.  Id. at p. 18.

On April 30, 2012 the bankruptcy court conducted a trial on the issue of a simulated contract.  On November 14, 2012, the bankruptcy court ruled on the issue of "whether the properties presently under Ms. Chico's name are property of the estate[,] which in turn hinges on whether [the Sucesion] has established that there was a relative simulated contract in the modality of the identity or in the subjects of the contract in which Ms. Chico interposed as a straw person between the seller and Mr. Gonzalez."

(Docket No. 7-9 at p. 6.)   Finding that Ms. Chico served as the intermediary between the sellers of the real estate and the "real party that purchased these properties[,] which was the conjugal partnership composed of Mr. Gonzalez and Ms. Collazo," the bankruptcy court concluded that Mr. Gonzalez pursued an illicit and ineffective *inter-vivos* donation of properties to Ms. Chico.  Id. at pp. 19-20.   As a result of the simulated contract, the bankruptcy court held that the properties belong exclusively to the conjugal partnership of Ms. Collazo and Mr. Gonzalez, and they do not constitute part of Ms. Chico's estate.  Id. at p. 20.  The Chicos appeal both bankruptcy court decisions.

## DISCUSSION

### I.   Standards

#### A.   District Court Review of Bankruptcy Decisions

Pursuant to 28 U.S.C. § 158(a), a district court has jurisdiction to hear appeals from judgments in bankruptcy.  On appeal, a district court may affirm, modify, or reverse a bankruptcy court's judgment, or remand with instructions for further proceedings.  Fed. R. Bkrtcy. P. 8013.  "The scope of this task, however, varies depending on whether the appeal revolves around findings of facts or conclusions of law."  Segarra-Miranda v. Perez-Padro, 482 B.R. 59, 67 (D.P.R. 2012).  In reviewing a bankruptcy court's decision, "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly

erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr. P. 8013; see also Fed. R. Civ. P. 52(a)(6).  Pursuant to the "clear erroneous" standard, a reviewing court will only reverse a prior decision if it has the "definite and firm conviction that a mistake has been committed."  In re the Bible Speaks, 869 F.2d 628, 630 (1st Cir. 1989) (citing Anderson v. Bessemer City, 470 U.S. 564, 573 (1985) (finding no clear error where the record supported the bankruptcy court's conclusion and the facts underlying it)).  "This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently."  Anderson, 470 U.S. at 573.

In contrast, a district court considers a bankruptcy court's conclusions of law de novo.  Palmacci v. Umpierrez, 121 F.3d 781, 785 (1st Cir. 1997).  It must therefore analyze and solve issues from the same perspective of the bankruptcy court, as if the issues were to be decided for the first time.  Segarra-Miranda, 482 B.R. at 67 (citing Water Keeper Alliance v. U.S. Dept. of Defense, 271 F.3d 21, 31 (1st Cir. 2001)).

**B.    Scope of the Appeal**

The parties dispute the scope of the issues on appeal. Pursuant to Bankruptcy Rule 8006,[3] the Chicos-Appellants filed a statement listing the following two issues for appellate review:

> 1. Whether the Bankruptcy Court erred when [it] found that the doctrine of acquisitive prescription is inapplicable in this case.
>
> 2. Whether the Bankruptcy Court erred when [it] found that the real properties registered in the Registry of Property in the name of the Debtor did not belong to her, but to the conjugal partnership which was composed of Mrs. Juana Collazo and Mr. Felix Gonzalez Figueroa.[4]

The Chicos argue that the acquisitive prescription issue is not appropriately before the Court, because the Chicos waited to appeal the bankruptcy court's September 8, 2011 O&O — which disposed of the adverse possession issue — until too late, on November 30, 2012. (Docket No. 23 at pp. 15–17.)  The Sucesion contends that the bankruptcy court's O&O became the law of the case, and is "final[,] and inappealable" [sic].[5]  (Docket No. 23 at p. 17.)  In

---

[3] Rule 8006 requires an appellant to furnish "a statement of the issues to be presented" on appeal.

[4] The Chicos re-phrase the issues for the Court's consideration into three topics: (1) whether a simulated contract or an *inter vivos* gift of monies existed between Mr. Gonzalez and Ms. Chico; (2) whether the cause of action to challenge Mr. Gonzalez's alleged "gift of monies" to Ms. Chico is time-barred; and (3) whether Ms. Chico acquired title over the real properties by ordinary acquisitive prescription.  (Docket No. 21 at p. 11.)

[5] They also cite the doctrines of *res judicata* and estoppel in support of their contention that consideration of the adverse possession issue is improper.  (Docket No. 23 at pp. 15–17.)

response, the Chicos contend that the Court has jurisdiction to review "the entire adversary case[,] including all the interlocutory orders and final judgment entered by the Bankruptcy Court that disposed of all the claims in this case." (Docket No. 19 at p. 3.)

As a prior[6] interlocutory order, the bankruptcy court's September 8, 2011 O&O is reviewable on appeal. All prior interlocutory orders, opinions and non-final partial judgments are subject to review along with the appealable judgment. See Brandt v. Wand Partners, 242 F.3d 6, 15 (1st Cir. 2001) ("Where the district court has made interlocutory decisions before entering a final judgment, an appeal from the final judgment brings up the interlocutory decisions for review . . . ."). Accordingly, the

---

[6] The Chicos are incorrect in referring to the September 8, 2011 O&O as an interlocutory order that is "not subject to appellate review as of right until all the controversies in the case have been ruled upon by the Bankruptcy Court." (Docket No. 19 at p. 3.) The bankruptcy court's September 8, 2011 O&O remained an interlocutory decision only until the bankruptcy court entered judgment on November 16, 2012. At that time, it became final. This distinction, however, is irrelevant to the Court's ability to review the O&O. See John's Insulation, Inc. v. L. Addison & Assocs., Inc., 156 F.3d 101, 105 (1st Cir. 1998) ("It has been uniformly held that a notice of appeal that designates the final judgment encompasses not only that judgment, but also all earlier interlocutory orders that merge in the judgment.") (citing cases from other circuits); see also EEOC v. Union Independiente De La Autoridad De Acueductos, 279 F.3d 49, 54 (1st Cir. 2002) (citing John's Insulation); Picard v. Members of the Employ. Ret. Bd., 275 F.3d 139, 144 n.5 (1st Cir. 2001) (same); Tringali v. Hathaway Mach., 796 F.2d 553, 559 (1st Cir. 1986) (indicating that entry of a final, appealable order will enable an appellant to request review of earlier nonfinal decisions upon which the final decision rests).

Civil No. 12-1986 (FAB)                                              12

Court turns to the issues of acquisitive prescription and simulated contract, in turn.

## II. Analysis

### A. Acquisitive Prescription

The Chicos appeal the bankruptcy court's rejection of the claim that Ms. Chico acquired the properties through ordinary acquisitive prescription. Claiming that Ms. Chico accepted the title to the properties from Mr. Gonzalez in good faith, and that she possessed the properties as the "owner public [sic], peacefully[,] and interruptedly since 1979 to the present," the Chicos argue that Ms. Chico met all requirements under ordinary acquisitive prescription, and that therefore she became the lawful owner of the properties in question by June 16, 2002. (Docket No. 21 at pp. 33-34; Docket No. 6-10 at p. 15.)  They claim that Mr. Gonzalez and Ms. Collazo were "present" for purposes of article 1857 of the Civil Code, P.R. Laws Ann. tit. 31 § 5278, and therefore that "any defects that Ms. Chico's title to the properties may have existed were cured by 1991 . . . ." Id. at p. 16.  They also claim that the provisions of article 106 of the Mortgage Law, P.R. Laws Ann. tit. 30 § 2356, are not incompatible with article 1854 of the Civil Code, P.R. Laws Ann. tit. 31 § 5275, because in this case Ms. Chico "is the recorded title holder of the properties in question." (Docket No. 6-12 at pp. 7-8.)

In contrast, the Sucesion disputes that Ms. Chico fulfilled the uninterrupted and public possession requirements of the adverse possession doctrine in Puerto Rico; accordingly, they contend that the property belongs to the sucesion of Mr. Gonzalez and Ms. Collazo. They claim that Ms. Chico was not a good faith possessor with proper title because she did not buy the properties; rather, Mr. Gonzalez purchased the properties, possessed them, and was their owner until he died on April 3, 2002. (Docket No. 6-11 at pp. 55-57.) They argue that Ms. Chico knew that Mr. Gonzalez was in possession of the properties because she lived with him when he bought the properties, and they admit only that Ms. Chico possessed the properties merely "by an act of mere tolerance" — with Mr. Gonzalez's permission.[7] (Docket No. 6-11 at p. 53.)

In its September 8, 2011 O&O, the bankruptcy court cited the pertinent Civil Code articles regarding prescription and correctly reasoned that the various sections "must be read in conjunction" with each other. (Docket No. 6-13 at p. 13.) In Puerto Rico, a person may acquire ownership and other property rights by prescription "in the manner and under the conditions specified by law." P.R. Laws Ann. tit. 31 § 5241. To acquire ordinary prescription of ownership and other property rights,

---

[7] The Court notes that Ms. Chico's mere possession by tolerance does not grant her ownership rights of the properties. See P.R. Laws Ann. tit. 31 § 5263 ("Acts of a possessory character, performed . . . by mere tolerance on the part of the owner, are of no effect for establishing possession.").

possession in good faith and under a proper title are necessary for a time specified by law.  P.R. Laws Ann. tit. 31 §§ 5261 & 5272.  "Possession must be in the capacity of an owner, public, peaceful, and uninterrupted."  P.R. Laws Ann. tit. 31 § 5262.  "Good faith" possession "consists in his belief that the person from whom he received the thing was the owner of the same, and could convey his title."  P.R. Laws Ann. tit. 31 § 5271.  Proper title is "that which legally suffices to transfer the ownership or property right, the prescription of which is in question."  P.R. Laws Ann. tit. 31 § 5273.  Articles 1853 and 1854 of the Civil Code require that "[t]he title for prescription must be true and valid" and that "proper title must be proven; it never can be presumed."  P.R. Laws Ann. tit. 31 §§ 5274-75.  The Civil Code also provides that "[o]wnership and other property rights in real property shall prescribe by possession for ten (10) years as to the persons present, and for twenty (20) years with regard to those absent, with good faith and with a proper title."  P.R. Laws Ann. tit. 31 § 5278.  They also prescribe "by uninterrupted possession of the same for thirty (30) years without the necessity of title nor [sic]

good faith and without distinction between present and absent persons."  P.R. Laws Ann. tit. 31 § 5280.[8]

After citing the Puerto Rico statutes, the bankruptcy court held as "misplaced" the Chicos' reliance on the doctrine of acquisitive possession *secundum tabulas*.  (Docket No. 6-13 at p. 14.)  It cited Spanish commentators Roca Sastre and Roca-Sastre Muncunill as authority on the rationale behind the doctrine, explaining that:

> the reason [a]rticle 35 of the Mortgage Law of Spain (which is equivalent to [a]rticle 106 of the Puerto Rico Mortgage Law) was enacted is to enable the registered titleholder [—] that acquired from a *non dominus*, meaning a person who did not have ownership (property rights) over the real property, and who is not protected by the figure of the third party who acquired property in good faith, better known as the "tercero registral" codified in [a]rticle 34 of the Mortgage Law of Spain ([a]rticle 105 of the Puerto Rico Mortgage Law) [—] to acquire acquisitive possession *secundum tabulas* of a real

---

[8]  The bankruptcy court also referred to article 106 of the Puerto Rico Mortgage law:

> With regard to adverse possession on behalf of the recorded titleholder, the registration shall be the legitimate title, and it shall be assumed that he has owned it publicly, peacefully, uninterruptedly and in good faith during the time the entry is in force, and that of the predecessors from whom he acquired it.

P.R. Laws Ann. tit. 30, § 2356.  The Chicos argue on appeal that the bankruptcy court "erroneously interpreted and applied" the prescription statutes by "add[ing] to the ordinary prescription of ownership a requirement that the Civil Code does not provide." (Docket No. 21 at p. 29.)  They argue that the bankruptcy court improperly relied on article 106 of the Mortgage Law to find that Ms. Chico did not acquire the real property by ordinary adverse possession because she did not acquire the properties from a *non dominus*.  Id.

> property through ordinary prescription, meaning good
> faith and proper title.

(Docket No. 6-13 at p. 14) (citing Roca Sastre & Roca-Sastre
Muncunill, Derecho Hipotecario, Vol. II, 9-12, Barcelona, Ed. Bosch
(7th ed. 1979)).  For the doctrine of acquisitive prescription
*secundum tabulas* to apply, the following three elements must be
met:  (1) the registered titleholder and the possessor of the real
property must converge in the same person; (2) the ownership and
property rights must be susceptible of possession; and (3) the
registered titleholder is an *ad usucapionem* possessor because he or
she acquired the property from a *non dominus*, and is not protected
by the figure of the "tercero registral" or the third party that
purchased a real property in good faith.  (Docket No. 6-13 at
p. 14) (citing Roca Sastre & Roca-Sastre Muncunill at 17-18).

        Because Ms. Chico could not satisfy the third requirement
of the doctrine of acquisitive possession *secundum tabulas*, the
bankruptcy court ultimately dismissed the Chicos' adverse
prescription defense.  (Docket No. 6-13 at p. 15.)  Four sale and
purchase deeds were indeed recorded in the Property Registry naming
Ms. Chico as the registered titleholder.  Id.  Those deeds do not
demonstrate, however, that Ms. Chico purchased the properties from
their unrightful owners; each of the sellers had ownership rights
over the real properties that were duly registered in the Property
Registry.  Id.  Because Ms. Chico did not acquire title from a *non
dominus* — someone who lacks ownership or property rights over the

property and who is not protected by the "tercero registral" — the bankruptcy court found that the doctrine of acquisitive possession *secundum tabulas* did not apply to the case before it.  Id.

       The Court fully agrees with the bankruptcy court's analysis.  In this case, the acquisitive possession *secundum tabulas* does not apply.  Ms. Chico did not acquire the real estate properties from a person who was not the properties' owner, a *non dominus*.  Because she did not acquire by adverse possession ("usucapion"), article 106 of the Mortgage Law does not apply. Article 106 is a vehicle which establishes a presumption in favor of the registered owner who is in the process of acquiring a property by adverse possession.  P.R. Laws Ann. tit. 30 § 2356. The controversy between the Chicos and the Sucesion, therefore, must be resolved using contractual figures such as contractual simulation in any of its modalities.  Accordingly, the bankruptcy court's dismissal of the Chicos' adverse possession claim is **AFFIRMED**.

 **B.   Simulated Contract**

  **1.   Litigation Background**

       In order to determine whether the properties claimed by Ms. Chico constituted part of her bankruptcy estate, a trial was held on April 30, 2012.  The determination of that issue hinged on the question of whether a relative simulated contract in the modality of the identity or in the subjects of the contract

occurred. (See Docket No. 7-9 at p. 6.)  Post-trial submissions by

the parties followed, and on November 14, 2012, the bankruptcy

court issued an O&O ultimately determining that Ms. Chico's

bankruptcy estate did not include the real estate properties.  Id.

at pp. 19-20.  Considering the two witnesses' testimony and

documentary evidence presented at trial[9] as well as the undisputed

facts submitted by the parties, the bankruptcy court found that

Ms. Chico interposed as a "straw person" between the sellers of the

properties and the real buyer — Mr. Gonzalez — and that therefore

a relative simulated contract existed.  Id. at p. 19.  Because

Mr. Gonzalez had disposed of monies which belonged to his conjugal

partnership with Ms. Collazo to pursue an illicit *inter vivos*

donation of real estate to his daughters with Ms. Chico, the real

_____

[9] Two witnesses testified at trial:  Ms. Chico testified for
the Chicos, and Ms. Blanca Gonzalez-Collazo testified for the
Sucesion. (Docket No. 7-9 at pp. 4-6.)  In its November 14, 2012
O&O, the bankruptcy court summarized both Ms. Chico's and
Ms. Gonzalez's testimony.  It regarded their statements, however,
as inapposite to the controversy.  (Docket No. 7-9 at p. 4)
("[T]heir credible testimony did not provide any significant
evidence in support of the issue before the court."); See also id.
at p. 6 ("The testimony of [Ms. Gonzalez] does not add any material
evidence to the controversy before the court.").  The bankruptcy
court thus "substantially based" its findings on the uncontested
facts to which the parties agreed.  Id. at p. 4.

"Findings of fact, whether based on oral or documentary
evidence, shall not be set aside unless clearly erroneous, and due
regard shall be given to the opportunity of the bankruptcy court to
judge the credibility of the witnesses." See Fed. R. Bankr. P.
8013.  Upon review of Ms. Chico's and Ms. Gonzalez's testimony, the
Court defers to the bankruptcy court's findings regarding the
persuasiveness and relevance of the witnesses' testimony because it
finds no clear error.

estate properties belonged to that conjugal partnership, not to
Ms. Chico.  Id. at p. 20.

Unsatisfied with the bankruptcy court's ruling, the
Chicos appeal.  (Docket No. 21 at p. 11.)  They rely on a private
document signed between Ms. Chico and Mr. Gonzalez to contend that
the parties' intentions were for Mr. Gonzalez to give Ms. Chico a
gift "for the benefit of his minor daughters with her."  Id. at
p. 25.  Mr. Gonzalez, they claim, had "no intention whatsoever of
[Mr. Gonzalez] buy[ing] the properties for himself and us[ing]
[Ms. Chico] as a straw person to hide the properties from his
wife."  Id.  In response, the Sucesion contends that the trial
evidence established that Ms. Chico acted as a straw person for
Mr. Gonzalez in the transaction and that a simulated contract
consequently exists.  (Docket No. 23.)

**2.   Legal Analysis of the Bankruptcy Appeal**

The Court affirms the bankruptcy court's finding
regarding the existence of a simulated contract.  The bankruptcy
court correctly identified that "the doctrine of contractual
simulation in the modality pertaining to the identity of the
subjects in a contract is intricate in nature." (Docket No. 7-9 at
p. 12) (citing Martinez v. Colon Franco, 125 D.P.R. 15, 27-28
(1989)).  It then consulted extensive Puerto Rico case law and
treatises to grasp the legal concept thoroughly.  (See Docket
No. 7-9 at pp. 11-20.)  As Spanish commentators explain,

contractual simulation through the interposition by a real person
that serves as an intermediary takes place when (1) one person acts
in his or her own name to form with a third party a contractual
relationship, which is of actual interest to a second person — who
remains hidden from the contract; (2) an agreement exists between
the person who promotes the interposition and the person
interposed; and (3) the agreement sets forth the manner in which
the intermediary is to employ the legal obligations or duties that
he or she has obtained in his or her own name.   (See Francisco
Ferrara, La Simulacion de los Negocios Juridicos 277, Madrid, Ed.
Revista de Derecho Privado (1960)).[10]   Moreover, pursuant to the
Supreme Court of Puerto Rico:

> [s]imulation suggests the idea of concealment or
> trickery (ingannare = to trick, conceal).  F. De
> Castro y Bravo, El Negocio Juridico 338, sec. 116,
> Madrid, Ed. Inst. Nac. Est. Jur. (1967) . . . . In
> legal affairs, simulation in particular occurs when
> the parties in agreement deliberately make
> statements different from the internal will, in
> order to deceive third persons.'  L. Cariota
> Ferrara, El Negocio Juridico 440-441 (M. Albaladejo
> trans.)  Madrid, Ed. Aguilar (1956).  This implies
> that, in simulated contracts, the contracting
> parties fully agree to produce an appearance before
> third persons.  There is an agreement or common
> purpose to simulate.  II-1 J. Puig Brutau,
> Fundamentos de Derecho Civil 486, Barcelona, Ed.
> Bosch (2nd ed. 1978).

---

[10] The Court notes that no official translation currently
exists for the Spanish treatises and commentaries discussed in this
case.  The bankruptcy court provided the Spanish text in footnotes,
and in the interest of deciding the issue before it on appeal, the
Court fully adopts those translations.

Reyes v. Jusino, 116 D.P.R. 275 (1985), 16 P.R. Offic. Trans. 338, 347 (Apr. 3, 1985).

          In this case, a simulated contract in the modality of the identity of the subjects occurred through the interposition by a real person.  The private document between Mr. Gonzalez and Ms. Chico reveals that Mr. Gonzalez gave money to Ms. Chico to purchase four properties with the intention to make an *inter vivos* donation to the five daughters he fathered with her.  (Docket No. 6-7 at pp. 32-33.)  It is an uncontested fact that the real properties in controversy are registered under Ms. Chico's name — not Mr. Gonzalez's — but were acquired with Mr. Gonzalez's funds.  (Docket No. 7-9 at pp. 7-9.)  It is also an uncontested fact that in the private document[11] signed by Mr. Gonzalez and Ms. Chico, the former expressed his intention that the properties bought under Ms. Chico's name be given to the daughters they have in common as "an advance on the[ir] inheritance."  (Docket No. 6-7 at p. 33; Docket No. 7-9 at p. 8.)  The private agreement, as the bankruptcy court rightfully reasoned, "is the agreement by which the role of Ms. Chico as an intermediary is clearly established and defined, and establishes that she had the obligation to transfer these real

_____

          [11] The bankruptcy court correctly noted that the private agreement between Ms. Chico and Mr. Gonzalez serves as a counterdocument that is properly considered by the court as evidentiary in nature.  See Reyes, 16 P.R. Offic. Trans. 338 (citing A. Rodríguez-Adrados, Escrituras, Contraescrituras y Terceros, XXII Anales de la Academia Matritense del Notariado 229 et seq. (1978)).

estate properties to her five (5) daughters." (Docket No. 7-9 at
p. 16.) It is clear from the uncontested facts, therefore, that
(1) Ms. Chico acted in her own name to buy real estate property,
which is of actual interest to Mr. Gonzalez — who remained hidden
from the contract — from a third party; (2) the private document
constitutes an agreement between Ms. Chico and Mr. Gonzalez; and
(3) the private agreement sets forth the manner in which Ms. Chico
is to employ the legal obligations or duties that she obtained in
her own name. Accordingly, Ms. Chico served as the real person
interposed between the sellers of the properties and the real party
in interest, and the elements of a contractual simulation through
the interposition by a real person are met.

        Furthermore, Mr. Gonzalez's omission from the asset-
purchase agreements regarding the real estate properties, coupled
with Ms. Chico's trial testimony that the private agreement was
signed to "avoid problems," demonstrates the type of "concealment
or trickery" inherent to simulated contracts. See Reyes, 16 P.R.
Offic. Trans. 338 ("[I]n the relative modality[,] the apparent
transaction conceals a real transaction which the contracting
parties wish to withdraw from the curiosity or indiscretion of
third persons."). Ms. Chico also explained in open court that she
knew Mr. Gonzalez had another family with Ms. Collazo and that
Mr. Gonzalez was married to Ms. Collazo, but she clarified that she
believed Mr. Gonzalez was in fact Ms. Chico's husband because he

had five children with Ms. Chico and had lived with her for so many years.   (Docket No. 8-1 at p. 31.)   She indicated that Mr. Gonzalez's family with Ms. Collazo did not like Ms. Chico or her daughters, and that consequently Ms. Chico and Mr. Gonzalez signed the private agreement to "avoid problems."   <u>Id.</u> at pp. 25-26.  That admission supports the conclusion that Ms. Chico served as an intermediary to help "circumvent various legal dispositions regarding the disposition of conjugal assets by a spouse and illicit (ineffective) inter-vivos donations to (forced/'legitimarios') heirs by Mr. Gonzalez." (Docket No. 7-9 at p. 18.)

The bankruptcy court also correctly turned to the question of whether Ms. Chico's interposition in the purchase of the real properties occurred for a legal consideration.   (<u>See</u> Docket No. 7-9 at p. 17.)  In Puerto Rico, an interposed person is vested with all of the contractual rights and obligations derived from the contract only as long as the cause of the interposition is lawful.  (Docket No. 14-2 at 5) (official translation of <u>Martinez v. Colon-Franco</u>, 125 D.P.R. 15 (1989)); <u>See also</u> Francisco Ferrara, <u>La Simulacion de los Negocios Juridicos</u> 277, Madrid, Ed. Revista de Derecho Privado (1960).[12]  Although the Court agrees with the bankruptcy court's ultimate holding that the properties in question

---

[12] Again, the Court finds the bankruptcy court's translations of the Spanish Commentator's text to be accurate.  (<u>See</u> Docket No. 7-9 at p. 17 nn.8-9.)

do not constitute part of Ms. Chico's bankruptcy estate, it does
not agree with the bankruptcy court's finding that it is because
the properties belong to Ms. Collazo and Mr. Gonzalez's conjugal
partnership.

The bankruptcy court intertwined two concepts from
the Puerto Rico Civil Code in order to draw the conclusion that the
real estate properties included in the private document belonged to
Mr. Gonzalez's conjugal partnership with Ms. Collazo.  First, it
identified articles that discuss the effects of contracts that
either lack consideration or have an illicit consideration.
"Contracts without consideration or with an illicit one have no
effect whatsoever."   P.R. Laws Ann. tit. 31 § 3432.   "A
consideration is illicit when it is contrary to law and good
morals," id., and "[t]he statement of false consideration in
contracts shall render them void, unless it be proven that they
were based on another and real and licit one." Id. at § 3433.  The
bankruptcy court then discussed a spouse's inability to alienate
community property in Puerto Rico on his or her own.   "All the
property of the marriage shall be considered as partnership
property until it is proven that it belongs exclusively to the
husband or to the wife."   P.R. Laws Ann. tit. 31 § 3647.  Both
spouses act as administrators of the community property, and
purchases made by the spouses out of that community property is
valid "when they comprise things or articles for personal or family

use in accordance with the social and economic standing of the family." P.R. Laws Ann. tit. 31 § 284. "[E]xcept with the written consent of both spouses," neither party may alienate or encumber the real property of the conjugal community. Id. Furthermore, "[n]otwithstanding the provisions of section 284 of this title, neither of the two spouses may donate, alienate or bind for a consideration the personal or real property of the community property without the written consent of the other spouse . . . ." P.R. Laws Ann. tit. 31 § 3672.

The Court agrees with the bankruptcy court that the private agreement sets forth Mr. Gonzalez's reasons for wanting Ms. Chico to act as an intermediary: so that the purchase of the real properties would constitute an advancement of their five daughters' inheritance. Those funds did indeed constitute part of Mr. Gonzalez's and Ms. Collazo's conjugal assets and, pursuant to Puerto Rico law, they could not be alienated from the community property without Ms. Collazo's written permission. The uncontested material facts reveal that Ms. Collazo never appeared in the private document to consent to the transfer of the properties. The Court departs from the bankruptcy court's holding, however, that as a result (1) the private agreement was void as an illicit *inter vivos* donation; and accordingly that (2) the properties belong to Mr. Gonzalez's conjugal partnership Ms. Collazo.

As the Chicos argue, a "[d]ispositive contract of property of the conjugal partnership without the consent of one of the spouses **is annulable, not null and void.**  (Docket No. 21 at p. 26) (emphasis in original).  Pursuant to Puerto Rico law, a contract is "voidable" when the defect can be cured or ratified by an effected [sic] party, while a "void" contract is not curable for reasons of public policy.  In re J. Gus Lallande, Inc., 167 B.R. 742 (Bankr. D.P.R. 1994) (citing Supreme Court of Puerto Rico case law as well as a Spanish treatise).  Although the Supreme Court of Puerto Rico recognizes "as a general rule" that both spouses must provide their written consent to alienate the conjugal partnership's property, it has explicitly stated that an "act of disposition of community property done without the initial consent of [a wife is] not void . . . but voidable."  Trabal-Morales v. Ruiz-Rodriguez, 125 D.P.R. 340 (1990); (Docket No. 20-2 at pp. 4–5) (providing official English translation of Trabal-Morales). Article 1253 of the Civil Code sets a four-year statute of limitations for a civil action of annulability.  P.R. Laws Ann. tit. 31 § 3512.  Because the private agreement is a merely a voidable one, the party who claims the defect — in this case Ms. Collazo — had four years from the execution of the contract to raise the action of annulability.  See Besosa v. Corp. Azucarera de P.R., 137 D.P.R. 939 (1995); (Docket No. 34-2 at p. 4) (providing official English translation of Besosa); Arrieta-Gimenez v.

Arrieta-Negron, 672 F. Supp. 46, 49-50 (D.P.R. 1987) ("[S]uch an
action cannot be brought once four years have passed since the
execution of the contract.  No reasonable period for discovery is
given, nor will any other event toll the statute of limitations.").
It was not until 2002 — that is, twenty-one (21) years after
Mr. Gonzalez and Ms. Chico executed their private agreement — that
the Sucesion initiated the action of annulability.  The private
agreement, therefore, "was confirmed by the passage of time and by
the inaction of those whose responsibility it was to exercise the
annulment action."  See Besosa, 137 D.P.R. 939; (Docket No. 34-2 at
p. 4).  Accordingly, the bankruptcy court based its final holding
that the properties do not constitute part of Ms. Chico's
bankruptcy estate on the erroneous conclusion that the omission of
Ms. Collazo's written consent rendered the private agreement null
and void.  An issue remains about the enforceability of the private
agreement's provision that the funds Mr. Gonzalez provided "[were]
an advance on the inheritance that at his passing shall go to his
five daughters who bear the GONZALEZ-CHICO last name, mentioned in
the First paragraph . . . ."  (Docket No. 7-9 at p. 10 n. 1.)
Although the bankruptcy court took a stance on the issue,[13] whether
the property belongs to the Sucesion or to Ms. Chico's daughters
does not affect the Court's holding here that the properties are

_____

[13] As discussed above, the bankruptcy court held that the real
properties belonged to the conjugal partnership of Ms. Collazo and
Mr. Rodriguez, not to the children of Ms. Chico.

Civil No. 12-1986 (FAB)                                              28

not included in Ms. Chico's bankruptcy estate.  Thus, that issue is

not for the Court to decide, and the bankruptcy court's decision is

**AFFIRMED**.

### CONCLUSION

For the reasons discussed above, the Court **AFFIRMS** the

bankruptcy court's September 11, 2008 O&O disposing of the Chicos'

acquisitive prescription argument.  It also **AFFIRMS** for different

reasons the bankruptcy court's November 14, 2012 holding that the

real estate properties at issue do not constitute part of

Ms. Chico's bankruptcy estate.

Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, June 14, 2013.

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
United States District Judge